BENJAMIN SWAYZE, complainant, and JAMES SWAYZE and others, defendants.

1. A bill which sets up distinct and different causes of complaint, which destroy each other, and seeks different reliefs, inconsistent with each other, is multifarious; and, although no advantage be taken of the defect by the pleadings, the court may dismiss the bill, and will do it where the form of the bill embarrasses the court in the administration of justice.

2. The principle is familiar and well established, that in order to give a creditor a standing in the court, to enable him to question the conveyance of his debtor on account of fraud, he must have some lien on the property.

3. The only reason why the Court of Chancery interferes on behalf of a judgment creditor, is to remove the obstacle which has been fraudulently interposed to prevent the satisfaction of the judgment by due process of law. So, where the judgment was no lien upon the land, and the complainant did not show that he had exhausted his remedy by execution, or any reason why he did not enforce his judgment against his debtor, but the bill showed that the debtor had abundant personal property to satisfy the judgment, after a delay of fourteen years, and after the debtor is dead, this court will not interfere on behalf of the judgment creditor, to set aside a conveyance which had been made by the debtor, for fraud.

This cause was argued at Newark, December 7th, 1852, on the pleadings and proofs.

The bill charges that, in the year 1831, one Daniel Swayze was seized in fee of a farm in the county of Morris, of the value of five thousand dollars, and described in the bill, containing about one hundred and eighty-nine and sixty-eight hundredths acres.

That Daniel Swayze was the father of six children, to wit, the complainant, and the defendants, Isaac, James, Mary, Mehetable, afterwards wife of John Sliker, and Sarah, afterwards wife of Andrew Sliker.

That Isaac and James, on or about the 10th of July, 1831, induced their father to make them a deed, in fee simple, for the said farm, and that on that day, D. S. and wife did execute to them such deed, purporting, on its face, to be for the consideration of two thousand dollars.

That at that time, the complainant was in the possession of the farm, as tenant; that James and Isaac commenced an ejectment suit against him, at September Term, 1832, of the Supreme Court, and that he, the complainant, being poor, was obliged to give up possession.

That D. S., at the time he executed the deed aforesaid, was seventy-five years of age; that he was, at all times, a man of weak mind, and, at the time of making the deed, was incompetent to attend to any business whatever, and was unfit, on account of the infirmity of his mind, to execute the conveyance aforesaid.

That Isaac and James obtained the deed by false and fraudulent representations, and without any consideration.

That they represented to D. S. that the complainant had an unjust and illegal claim against him, and would sell his farm to pay it, and that if he would make a deed to them for the farm, they would either pay him two thousand dollars, or make him good security for it—would take care of him during his life—provide for his wants, and, at his death, make a division of the farm among the brothers and sisters, notwithstanding the deed.

That, by means of these representations, D. S. made the deed to them.

That the representations so made were deceptive, false, and fraudulent.

That, at that time, the complainant had a just and legal claim against D. S., and which the said James and Isaac well knew, and they combined together to defraud the complainant out of his debt.

That James and Isaac never paid the two thousand dollars consideration money, or any part of it, or secured it; that they did not provide for him, but neglected to do it.

That since the conveyance, James and Isaac have occupied the land, and enjoyed, for their own use, the rents and profits.

That, at the time of acknowledging the deed, D. S. stated that he was induced to make the deed solely on the above representations; that no arrangement had then been made to secure him the two thousand dollars, and he was afraid

they never would; and D. S.'s wife, at same time, made like statements.

That the old man, during his life, frequently charged James and Isaac with having deceived him, and that they knew complainant's debt was just, and ought to be paid, and at one time, on such charges, or similar ones, being made, Isaac acquiesced.

That D. S. died about the 1st of August, and his wife the 1st of October, 1841.

That at his death he left personal property of the value of five hundred dollars, and in money four hundred dollars; that he received a pension of fifty-six dollars and sixty-seven cents per annum, commencing on the 4th of March, 1831, and ending September 4th, 1843, amounting in all to seven hundred and eight dollars and thirty-seven cents.

That Isaac and James, or one of them, was in the habit of receiving the pension money, and had a considerable part of it in their hands at the old man's death.

That Isaac and James received one hundred and eleven dollars of other moneys to which D. S. was entitled, from different individuals; that no letters of administration were ever taken out, and that Isaac and James took all his personal estate and converted it to their own use, and never accounted for any part to the complainant.

That I. and J. took possession of all the papers; that D. S. left no debts at his death except the one to complainant; that the complainant is the heir-at-law of D. S. to the one-sixth part of his estate, real and personal.

That D. S., at his death, was indebted to the complainant in the sum of three hundred dollars, for money paid for D. S. and at his request; in the further sum of one hundred dollars for work, labor, &c., and for goods, wares and merchandise sold and delivered to him; in the further sum of one hundred and sixty-five dollars principal, costs and interest due on a judgment recovered by complainant against D. S. before a justice of the peace of the county of Morris, on 21st September, 1835.

That Bethuel, one of the children and heirs of D. S., died

about 1st April, 1840, and the other children, refusing to join as complainants in this bill, are made defendants.

The bill prays that the deed from D. S. to his sons may be set aside, and account taken of the rents and profits of the lands.

That an account may be taken of the personal property of D. S. that has come to the possession of the said I. and J., and full settlement of the estate be had, and the value of the lands be ascertained.

That an account may be taken of what is due to the complainant, and that a receiver may be appointed.

That the said lands may be sold, and that out of the moneys so arising the complainant may be paid the amount due to him from the said D. S., and that after the complainant has been paid said amount so due him, the complainant may receive his sixth part of the said real and personal estate.

And that the complainant may have such other relief, &c., &c.

The answer denies the equity of the bill.

In reference to the conveyance to them, the defendants state:

That their father was about seventy years of age, and from the natural abatement of his strength was unable personally to attend to the proper cultivation of the farm; that he was embarrassed by debt which he had incurred both on his own account and that of complainant, to an amount of several hundred dollars, and was threatened with prosecution; that he became uneasy lest his property should be sold to pay his debts, and he complained of the complainant's (who then lived with him) not keeping the farm in order, and of his unkind treatment to him and his wife; that both the old man and wife frequently applied to them, and urged them to purchase, and keep it as a home for them.

That finally they agreed with their father to buy the farm on the following terms: They agreed, in consideration of a conveyance to them, to provide for their father, their mother, and their sister, Mary Swayze, (who had always been afflicted

with imbecility of mind,) a comfortable maintenance and support for and during their natural lives. They further agreed to pay off their father's debts, and which debts, their father stated, would be about, as he supposed, three hundred dollars, but which amounted to about eight hundred dollars. They further agreed that, after the death of their father, they would pay their sister, Mehetable Sliker, one-third of the difference between the amount of their father's debts and the sum of one thousand dollars, the other two-thirds of that difference to be retained by and equally divided between the defendants, their father averring at the time that the complainant and Sarah Sliker had had more than their full share of his property.

That in pursuance of this agreement the deed was made, and that they have faithfully performed their part of the agreement, which was the consideration of the deed ; that they have paid off debts to the amount of about eight hundred dollars, maintained their father and mother during their lives, and have maintained their sister since.

That when they took possession, the farm was worn out ; that they built two houses, in one of which their parents lived during their lives.

They deny the charge of their father's incapacity, and insist the consideration was an ample one.

They deny circumstantially any charge made in the bill of fraud.

They admit that, at his death, their father left some personal property, but of small value. They deny that any of it ever came into their possession, but say that it was taken by their sister, and claimed by her as having been given her by her father. They deny that their father, at his death, had any money or obligations, to their knowledge, and they do not believe he had.

They admit their father received the pension, and that he expended it for his own support. They deny they ever had any of it to their own use.

They admit that no letters of administration have been

taken out, and that at the time of his death their father owed no debts.

They deny, according to their best knowledge and belief, that their father owed complainant. They admit the judgment, but insist it was improperly obtained.

The complainant filed a replication, and proofs were taken on both sides.

The other defendants did not answer.

*J. G. Shipman,* for complainant.

*T. Little,* for defendants, James and Isaac Swayze.

THE CHANCELLOR. This bill is multifarious. It sets up distinct and different causes of complaint, which destroy each other. It seeks different reliefs, inconsistent with each other.

It asks for relief, on the ground that the complainant is a creditor, and that the real estate in controversy was conveyed to two of the defendants by the complainant's debtor, for the purpose of defrauding him. The decree that the complainant is entitled to in this aspect of the bill, is that the property is held subject to his debt.

But the complainant asks relief on another ground: that he is the heir-at-law of Daniel Swayze; that the two defendants, James and Isaac Swayze, of whose fraud he complains, procured the conveyance from their father, who was an old man, broken down by age, and not of sufficient mental capacity to transact business, by fraud and misrepresentations. The relief to which the complainant is entitled, in this aspect of the bill, is that the deed be decreed absolutely null and void, and the complainant, as one of the heirs-at-law of Daniel Swayze, entitled to the one-sixth part of the land and premises.

If the complainant is entitled to relief on the first ground, the conveyance, as between the parties to it, is valid; and it is valid against the complainant, as an heir-at-law, because

in this aspect, he stands in the same position as his ancestor, and can have no redress to which he would not have been entitled.

The different characters in which the complainant is prosecuting this suit, are, on account of the subject matters of the suit, inconsistent with each other.

The bill seeks relief upon another ground. It alleges that the two defendants, James and Isaac Swayze, took possession, on their father's death, of all his personal property, of considerable amount; that no letters of administration have been taken out, and that the said defendants have refused to pay the complainant's debt, or distribute the property, according to law, The complainant asks that his debt may be paid, and that the defendants may account to him for one-sixth of the personal estate.

If the court could interpose for the relief of the complainant upon this latter ground, it is a case for relief which could not properly be joined in one suit with the other cases for relief embraced in the bill.

But although this bill is multifarious, no advantage has been taken of it by the pleadings, nor was the objection stated at the hearing. The objection must be taken by demurrer or plea, or be set up in the answer, and if it is not, the defendant cannot claim any benefit from such defect. But though the party may waive the objection, the court, *proprio jure*, may dismiss the bill, and will do it, where the form of the bill embarrasses the court in the administration of justice.

The conclusion I have reached on an examination of the evidence, enables me to dispose of the case without embarrassment, and there is no necessity, therefore, for the court's interposing and dismissing the bill on account of the defect alluded to. I have noticed the form of the bill that it may not be referred to as a precedent, and that no conclusion may be drawn that the court will encourage laxity of pleading. Mere technicality should not be permitted, in this court, to interfere with the administration of justice, but looseness of pleading, which embarrasses a party in his defence, and

the court in determining the rights of suitors, and the relief to which they are entitled, ought not to be encouraged.

The complainant insists that the deed was made by Daniel Swayze to his sons, James and Isaac, for the purpose of defrauding the complainant, who was a creditor.

This ground was pressed with much earnestness by the complainant's counsel, and he insisted, with great confidence, that the evidence was irresistible to establish the fraud. Admitting the conclusion to be correct as to the evidence on this branch of the case, is the complainant entitled to relief?

The principle is so well established, and is so familiar, that in order to give a creditor a standing in the court, to enable him to question a conveyance of his debtor on account of fraud, he must have some lien on the property, that it is unnecessary to cite authorities on the point.

The complainant, on the 21st of September, 1835, recovered a judgment in a justice's court against Daniel Swayze, for the sum of ninety-eight dollars and ninety-nine cents, and on the 24th of September, 1849, he files his bill in this court, and asks to have a conveyance made by his debtor on the 10th of January, 1831, set aside for fraud.

This judgment, by the statute, was no lien upon the land, and the complainant does not show that he had exhausted his remedy by execution, or any reason why he did not enforce his judgment against his debtor. Indeed, the complainant shows by his bill that his debtor had abundant personal property to satisfy the judgment. Under these circumstances, after a delay of fourteen years, and after his debtor is dead, there is no propriety in the court's interfering on his behalf, even if his judgment was of a nature to warrant it.

The only reason why the Court of Chancery interferes on behalf of a judgment creditor is, to remove the obstacle which has been fraudulently interposed to prevent the satisfaction of the judgment by due process of law. But if this conveyance had never been made, the judgment could not have been enforced against this land.

In this aspect of the case the complainant is not entitled to relief.

But the complainant further insists that he is one of the heirs-at-law of Daniel Swayze, and, as such, is entitled to the one-sixth of his real estate; that at the time of the execution of the deed his father was aged and infirm in body and mind, and not of sufficient mental capacity to dispose of his property; that the grantees induced him, by fraud and misrepresentations, to execute the deed, and that, for these reasons the conveyance should be declared void. But if the complainant has proved beyond a doubt, as his counsel insists, that Daniel Swayze executed the deed to defraud a creditor, such proof destroys whatever case the complainant may have had as an heir-at-law. If Daniel Swayze's purpose in executing the deed was to defeat his creditors, though the deed is void as to them, it is valid as between the grantor and grantees, and, of course, as between the grantor's heirs and the grantees. It is valid, then, against the complainant, as an heir-at-law of Daniel Swayze.

The evidence is not of a character to leave room to doubt but that Daniel Swayze, at the time he executed the deed, was of sufficient mental capacity to dispose of his property. It is true he was an old man, and in body and mind was suffering under the infirmities of old age. He had, up to this period, transacted all his own business—had considerable pecuniary dealings with his neighbors—and his friends who were in constant intercourse with him, and persons with whom he dealt, do not express a doubt as to his sufficient mental capacity to dispose of his property. Two or three witnesses, produced on behalf of the complainant, do express such doubts, but there are a large number of witnesses opposed to them, and such as were better capable, from many considerations, to give a judgment on this subject. The witnesses who express a doubt, give no reasons for their opinion, and allude to no circumstance in the old man's conduct to justify it. He lived for more than six years after the deed was executed. During that period there was no

unusual abatement of his natural vigor of mind or body. He retained his mental faculties until his death, impaired only by the ordinary infirmities of advancing age.

Nor is there any evidence to sustain the charge that the deed was procured from the old man by the fraud and misrepresentations of his sons. The defendants, in reply to this charge, in their answer deny it; and allege that it was at their father and mother's earnest and repeated solicitations that they consented to take the deed, and that they took it with the view, not of speculation, but to relieve their aged parents. And they prove this by the declarations of their father and of their mother, made in the father's presence, and under circumstances which entitle the defendants to the full benefits of the declarations. The evidence was objected to, but it is admissible. In the aspect of the case to which our attention is now directed, the complainant is claiming as an heir-at-law. He assumes the position of his ancestor in impeaching the deed; and the same evidence which would be admissible if his ancestor were the complainant, is proper in this suit.

As an evidence of incapacity of the grantor, and fraud on the part of the grantees, it is insisted that the price of two thousand dollars was inadequate. The weight of evidence is, I think, very strong, that the price named was, at the time, the full value of the farm. It was the price fixed by the grantor himself in offering to sell the farm to strangers, and men of character, living in the neighborhood, acquainted with the premises, and good judges of the value of land, declare that two thousand dollars was the full value.

I think the evidence falls very far short of making a case of incapacity of mind in the grantor, or of fraud or imposition on the part of the grantees.

But the complainant takes another ground. He insists that the consideration agreed upon between the parties to the deed has never been paid, and that the grantees must account for it.

I have not overlooked the fact that this view of the case

was urged also as an evidence of the fraud, taken in connection with other circumstances of the case, and in examining the question of fraud, I gave to the complainant the full benefit that the evidence on this point, in my judgment, was entitled to.

As to the consideration of the conveyance: the complainant alleges in his bill that no part of the consideration has been paid; that at the time the deed was executed, the defendants, James and Isaac, promised and agreed with their father that they would take charge of the property for him, and would either pay him the sum of two thousand dollars, or else would give him good security for it; that they would take care of their father during the remainder of his life, provide for all his wants, and at his death would make a division of his lands among all the children.

These allegations are made in the bill to show, in part, the means by which the old man was imposed upon, and to establish the alleged fraud; and, indeed, unless they are available to the complainant on the question of fraud, they cannot avail him at all. If the consideration money has not been paid it remains a lien upon the land. But the complainant cannot recover it or any part of it in this suit. It belongs to the personal representative, and must pass through his hands in the administration of the estate.

But how stands the case, upon the evidence, as to this question.

The defendants, in their answer, state, in reference to the consideration, that they agreed to purchase the farm on the following terms: To provide for their father and mother, and their sister Mary, who lived at home, and who has always been afflicted with imbecility of mind, a comfortable maintenance and support during their lives; to pay and discharge all their father's debts, which, he supposed, would amount to three hundred dollars, but which, in fact, amounted to about eight hundred dollars; that, after the death of their father, they would pay to their sister, Mehetable Sliker, one-third of the difference between their father's debts and the sum of one thousand dollars, the remaining two-thirds of that differ-

ence to be retained by and equally divided between themselves.

The defendants show that their father was embarrassed, and without means to pay his debts and liabilities, except by a resort to the farm for the purpose, and that it was necessary he should either sell the farm to strangers, or make some family arrangement to relieve him from that necessity; that he was unkindly treated by his son, the complainant, and had involved himself in debt on the complainant's account; that his children had had their share of his property, except his sons James and Isaac, and his daughters Mehetable and Mary, and that he had declared the complainant should have no portion of his estate.

These facts the defendants prove by the old man's declarations. His declarations were admissible for this purpose, for, as has been stated, the complainant occupies the position of his father, and the same evidence that would have been admissible against him is proper evidence against the complainant.

The defendants further prove that their father and mother, during their lives, occupied a house on the farm; that they were comfortably maintained and provided for, and that it was the common understanding of the neighborhood that they were maintained by their sons, the defendants. There is proof that the maintenance they received was worth two hundred dollars a year, and that it was worth a hundred dollars to provide and take care of Mary; that she resided with her parents during their lives, and, since then, has lived with one of her brothers. She makes no complaint against the defendants, of not fulfilling their agreement, as far as she is concerned.

The defendants state, in their answer, that they paid debts of their father to the amount of eight hundred dollars. They produce, in their possession, evidences of debts paid to nearly that amount. It is true the proof of all these debts having been paid by them does not come quite up to legal proof, but after the complainant's postponing his suit for fourteen years, it is unreasonable to expect of the defend-

Swayze v. Swayze et al.

ants that strict proof that would be required of them in reference to recent transactions.

There is evidence that the old man had some means of supporting himself from a pension he received from the general government, and that he used the money for that purpose. But there is nothing to warrant the supposition that he used the money from necessity, or because his sons had failed to provide for him, or shown a disposition to withhold anything that was necessary for the comfort of his household.

From a careful examination of all the evidence, I do not think there is anything in the case to warrant me in disturbing the deed.

The complainant's bill must be dismissed, with costs.

CITED *in Robert* v. *Hodges & Fuller,* 1 *C. E. Gr.* 303 ; *Green* v. *Tantum,* 4 *C. E. Gr.* 107 ; *Veghte* v. *Rar. Water Power Co.* 4 *C. E. Gr.* 146 ; *Tantum* v. *Green,* 6 *C. E. Gr.* 365 ; *Davis* v. *Dean,* 11 *C. E. Gr.* 436.